**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PATRICK NICHOLS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge Nixon** |
| | ) | **Case No. 3:03-1341** |
| **JOHN SNOW, SECRETARY,** | ) | |
| **DEPARTMENT OF THE TREASURY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM ORDER

Before the Court is Defendant's Motion for Summary Judgment and supporting memorandum (Doc. Nos. 25, 26), to which Plaintiff has responded (Doc. Nos. 28, 29). For the reasons stated herein, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment, and DISMISSES the state law claims.

## I. BACKGROUND

Plaintiff Patrick Nichols ("Nichols" or "Plaintiff") was employed by the Internal Revenue Service ("IRS") in Nashville, Tennessee, as a Customer Service Representative from October 1998 to April 1999, and again from November 1999 to April 2000. During the second period of employment, Plaintiff resigned during his probationary period. Nichols was hired again by the IRS on June 17, 2001, as a Revenue Officer Trainee ("ROT") in Nashville, Tennessee, after

1

Territory Manager John H. Lee ("Lee") recommended Nichols for hiring. This position was subject to a one-year probationary period, pursuant to 5 U.S.C. § 7511.

ROTs were each assigned an on-the-job instructor ("OJI"), who was to provide one-on-one supervision and instruction to them. Revenue Officer John Chaffin ("Chaffin") was assigned to serve as OJI for Plaintiff, as well as for a few other trainees. Dianne Beard ("Beard") served as Group Manager and supervisor of Chaffin and the trainees, including Nichols.

In August 2001, Nichols was sent to Dallas, Texas for training, along with other ROTs and their respective OJIs. Nichols apparently performed well in his training class and scored well on his tests. However, Nichols reports that while in Dallas an incident occurred as Nichols and the other trainees walked to a karaoke bar one evening after dinner with Chaffin and another OJI. Nichols claims that upon reaching the bar, Chaffin announced that he (Chaffin) did not go into places like that nor associate with anyone who did. Nichols claims that Chaffin then proclaimed, "I have never done any drugs," to which Nichols responded that he had not either. Nichols claims that Chaffin laughed at Nichols' statement in front of the group. Then two or three ROTs returned to the hotel with Chaffin, and Nichols and three other ROTs went into the karaoke club.

Nichols claims that back at the workplace after training had ended, Chaffin treated him poorly by refusing to provide him assistance as an OJI; at times screaming, "look up the answer" when Nichols asked for help; by making negative gestures behind Nichols' back; by impressing his religion on Nichols, for example stating that the church was number one in Chaffin's life and degrading Nichols for not going to church; by telling Nichols that he needed to get married and settle down; and by indicating that the expensive items that Nichols owned, like a Corvette

convertible and a Rolex watch, were examples of Nichols' out-of-order priorities. Nichols claims that he does not consider himself a member of any organized religion.

On September 10, 2001, Nichols and Chaffin conducted field work together for the first time. Chaffin praised Nichols for conducting himself in a professional and courteous manner, and complimented him for a job well done in conducting and researching property tax assessor rolls. On September 12, 2001, Chaffin wrote Nichols a memorandum confirming that Nichols had completed the necessary training workshops in the previous month.

On Friday, September 14, 2001, Chaffin and Nichols again completed field visits together. At approximately 2:45 p.m., after their visits had concluded, Chaffin instructed Plaintiff to go home. Nichols arrived home at or about 4:15 p.m. At that time, Nichols determined that his tour of duty for the day was over because his usual day ended at 4:45 p.m. when in the office, and because he had not taken any fifteen minute breaks during the day.

As part of his regular job duties, Nichols met regularly with taxpayers, during which time he took handwritten notes. After meetings, Nichols would type the notes into an assigned laptop computer to create "case histories." On Monday, September 17, 2001, Chaffin saw that Plaintiff's case histories were not in the computer system, and asked Plaintiff about them. Nichols responded that since he had completed his handwritten notes regarding the field visits, he decided to wait until the next business day to transfer his case histories into the computer. Nichols also claims that Chaffin asked him what time he usually arrived home after work, and that Nichols told Chaffin between 5:45 p.m. and 6:00 p.m. Chaffin then told Nichols that Nichols should continue to work within his usual time schedule each day.

3

After hearing Nichols' explanation for failing to type his case histories on the day of their field visit, Chaffin allegedly asked Nichols what he had done upon arriving at home. Nichols told Chaffin that he had obtained a haircut and taken a nap. Plaintiff asserts that there was no need to take leave for the time that he spent on the afternoon of Friday, September 14, 2001, on activities not related to work, as he thought he had completed his tour of duty upon his arrival at home. Nichols also claims that he was never told that his field visit notes had to be typed on the same day that the meetings occurred. Moreover, Nichols asserts that this particular Friday was only three days after the September 11, 2001 disaster, and he had been upset and drained over the events of the week.

On September 24, 2001, Chaffin told Nichols that the September 14, 2001 incident had come to the attention of management and that Nichols was being charged with stealing government time. Nichols claims that he became very upset at this accusation and responded that he had never stolen time. Chaffin allegedly told Nichols that he would take care of the issue, and insisted that Nichols not see Beard, Nichols' manager, about the incident. During this interaction, Nichols also claims that Chaffin accused him of not having his priorities in order because he did not go to church and was not married.

On October 5, 2001, Chaffin issued written documentation to Plaintiff in the form of a memorandum regarding the September 14, 2001 time-reporting issue, instructed Nichols to take two hours of annual leave, questioned his ownership of a Corvette and a Rolex watch, and again reprimanded Nichols for not having his priorities in order. Nichols claims that although he wrote a rebuttal to this report, the IRS did not act upon it. Later that week, Chaffin heard Nichols discussing this memorandum with co-workers, and allegedly pointed his finger in Nichols' face

4

and yelled at Nichols for discussing the memorandum with others. Chaffin allegedly became visibly angered and told Nichols that he was acting like Chaffin's three-year-old child.

On another occasion, Nichols asked Beard if he could schedule an appointment to get braces put on his teeth. Beard claims to have advised Nichols that he could do so as long as leave time was approved for his dental appointments. Thereafter, it came to Beard's attention that Plaintiff had gotten braces on his teeth without asking for approval of leave time. Beard asked Plaintiff about the braces and Nichols told her that he had had the procedure done during his lunch break. When Beard requested that Plaintiff provide documentation regarding his dental procedure, Nichols provided records showing that the procedure began at 9:30 a.m. and lasted for forty-five minutes. Nichols claims that he traveled only one mile out of his way to get to his dentist's office, and that he did not think it was necessary to get Beard's approval for the procedure, since it took no more time than his lunch break and his daily allotted fifteen minute breaks.

In a performance and counseling report dated October 15, 2001, Beard directed Nichols to report one hour of annual or sick leave for the dentist visit. Beard stated in the report, "in addition to the 45 minutes to complete the procedure you had travel time to and from your taxpayer contacts which were in Sumner County. The dentist is located in Madison. This would have taken considerably longer than your 45 minute lunch period." (Internal Investigation at 138). Beard also reminded Nichols that accurate time reporting was a critical element of his job.

In October 2001, Lee decided to terminate Nichols' employment based upon the facts given to him by Beard regarding various time reporting issues. Beard informed Nichols that the

agency intended to terminate his employment for integrity issues and gave him the choice to resign in lieu of termination. Nichols requested and was granted the opportunity to discuss his conduct with Lee. Accordingly, Nichols met with Beard and Lee. At the conclusion of this meeting, however, Lee's decision to terminate Plaintiff's employment was unchanged. On October 19, 2001, Nichols resigned from his position with the IRS. Nichols sought equal employment opportunity ("EEO") counseling on the day of his resignation, and filed an EEO complaint claiming discrimination based on sex and religion on December 31, 2001.

Subsequent to Plaintiff's resignation, Nichols was tentatively selected for a Special Agent position with the IRS's Criminal Investigation Division ("CID"). In March 2002, Nichols asserts that he was interviewed by a background investigator, and that he told the investigator that he had a pending EEO claim and explained the circumstances surrounding his resignation. On or about March 19, 2002, a background investigator contacted Beard with regard to Plaintiff's CID application. Beard advised the investigator that Nichols had resigned from his position, but apparently did not provide the reason for Nichols' resignation. Beard also stated that she would not rehire Nichols, nor would she recommend him for re-employment with the IRS due to "some ethical issue" about which Beard did not elaborate. Nichols filed a second EEO complaint shortly thereafter, alleging retaliation and harassment based on Beard's negative comments.

On April 17, 2003, Plaintiff filed this lawsuit in the United States District Court for the Middle District of Tennessee, alleging unlawful employment discrimination. Count I of Nichols' Complaint, brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), sets forth allegations of discrimination on the basis of

6

sex and religion based upon his termination and alleges that Nichols was subjected to a hostile

work environment based on sex and religion. Count I also sets forth a claim of retaliation.

Count II of Nichols' Complaint sets forth the same claims pursuant to the Tennessee Human

Rights Act, T.C.A. § 4-21-401 ("THRA").


## II. STANDARD OF REVIEW

Summary judgment may be granted when there is "no genuine issue as to any material

fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In evaluating a motion for summary judgment, courts must view all the facts and the reasonable

inferences to be drawn from those facts in the light most favorable to the non-movant. See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party

bears the burden of proving the absence of a genuine issue of material fact as to an essential

element of the non-movant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A

genuine issue of material fact is one which, if proven at trial, would lead a reasonable fact finder

to find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-48 (1986).

The non-movant may not rely solely on conclusory allegations in the complaint to defeat

a motion for summary judgment, but must come forward with affirmative evidence that

establishes its claims and raises an issue of genuine material fact. Celotex, 477 U.S. at 324.

Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly

supported summary judgment motion; there must be a genuine issue of material fact. See

Anderson, 477 U.S. at 247-48. "The mere existence of a scintilla of evidence in support of the

7

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Shah v. Racetrac Petroleum Co., 338 F.3d 557, 566 (6th Cir. 2003).

The substantive law involved in the case will underscore which facts are material, and only disputes over outcome-determinative facts will bar a grant of summary judgment. Anderson, 477 U.S. at 248.  Drawing all justifiable inferences in favor of the non-moving party, the Court must determine whether a reasonable fact finder would be able to return a verdict for the non-moving party and if so, the Court must deny summary judgment.  Id. at 249-50. However, if the non-moving party has not "produced enough evidence for a jury to be able to return a verdict for that party," summary judgment should be granted.  Tinsley v. Gen. Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000).

## III. DISCUSSION

In order to establish a case of discrimination under Title VII, the plaintiff has the initial burden of establishing a prima facie case that his employer discriminated against him because of his membership in a protected class.  See Beaven v. Commonwealth of Ky., 783 F.2d 672, 675 (6th Cir. 1986), citing Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867 (1984).   A plaintiff may establish a prima facie case of Title VII discrimination by direct or indirect evidence.  See Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  Direct evidence consists of evidence "which, if believed, proves the existence of improper discrimination animus without inference or presumption."  Williams v. United Dairy Farmers, 20 F.Supp.2d 1193, 1198 (S.D. Ohio 1998) (citations omitted).  Because such "smoking gun" evidence is rarely available,

Case 3:03-cv-00341   Document 34   Filed 01/23/06   Page 8 of 34 PageID #: 42

a plaintiff may also establish a prima facie case through the use of indirect evidence or circumstantial evidence. Woythal v. Tex-Tenn. Corp., 112 F.3d 243, 246 (6th Cir. 1997) (citation omitted). "The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." Kline, 128 at 348-49.

Title VII claims relying on indirect evidence are evaluated under the McDonnell Douglas burden-shifting analysis. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also EEOC v. Avery Dennison Corp., 104 F.3d 858, 862 (6th Cir. 1997). "This division of intermediate evidentiary burdens is not meant to stymie plaintiffs, but simply serves to 'bring the litigants and the court expeditiously and fairly to the ultimate question.'" Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660 (6th Cir. 2000), citing Tex. Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for his or her actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the defendant is able to accomplish this, then the burden shifts back to the plaintiff to demonstrate pretext. Id. Pretext can be demonstrated by showing that: "(1) the stated reasons for the defendant's action had no basis in fact; (2) the stated reasons for defendant's action were not the actual reasons; or (3) the stated reasons for the defendant's action were insufficient to explain the [adverse action taken]." Sampson v. Sec'y of Transp., 1999 WL 455399, at *2 (6th Cir. June 23, 1999). The plaintiff retains the burden of persuasion at all times. Burdine, 450 U.S. at 256.

Plaintiff has set forth allegations of discrimination and of a hostile work environment based on sex and religion. Additionally, Plaintiff has proffered a claim of unlawful retaliation.

9

Nichols brings these claims pursuant to Title VII, and reasserts them in Count II under the

THRA. Title VII prescribes federal employment discrimination and otherwise establishes an

administrative and judicial enforcement system intended to be both exclusive and preemptive of

state law claims. See Brown v. Gen. Servs. Admin., 425 U.S. 820, 829 (1976). In Brown, the

Supreme Court held that section 717 of Title VII provides an exclusive judicial remedy for

claims of discrimination in federal employment. Id. at 835. The Sixth Circuit later clarified that

Title VII's statutory scheme "is . . . exclusive and preemptive of any state law claims with

respect to federal employees." Humm v. Crowell, 1998 WL 869981, at *5 (6th Cir. Nov. 30,

1998). In his memorandum in opposition to Defendant's Motion for Summary Judgment,

Plaintiff acknowledges that his THRA claims must fail.

As Title VII provides the exclusive remedy for federal employees alleging discrimination

by their federal employer, Count II of Nichol's Complaint, asserting claims of discrimination

pursuant to the Tennessee Human Rights Act, must be DISMISSED. The Court will address

each of Plaintiff's Title VII claims in turn.


### A. Sex Discrimination

Nichols first sets forth a claim for sex discrimination involving circumstantial evidence.

However, Nichols' claim is "reverse" sex discrimination, as he is a male. In typical sex

discrimination cases involving circumstantial evidence, to make a prima facie case, the plaintiff

must show: (1) that he is a member of a protected class; (2) that he was qualified for the position;

(3) that he suffered an adverse employment action; and (4) that he was treated differently than

other similarly situated employees outside the protected class. See Sutherland v. Mich. Dep't of

Treasury, 344 F.3d 603, 614 (6th Cir. 2003). The Sixth Circuit includes an additional requirement for plaintiffs bringing reverse discrimination claims under the first prong: "the plaintiff must demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." Zambetti v. Cuyahoga Cmty. Coll., 314 F.3d 249, 255 (6th Cir.2002) (quotations and citations omitted). Also, to satisfy the fourth prong of the prima facie case, "the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." Id.

For the reasons below, the Court finds that Plaintiff does not meet his burden with respect to the first prong. Even if the Court did find that Plaintiff met his burden on this point, the Plaintiff still cannot set forth a prima facie case, because while he meets the second and third prongs, he does not meet his burden with respect to the final prong.

With regard to the first prong, as modified by the Sixth Circuit, Plaintiff is a male, but he has proffered no information to show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." Such background circumstances in a reverse sex discrimination case might include the fact that the employer is female, that the job is stereotypically viewed as being more appropriate for women, that the workplace has a disproportionate number of females, that the employer has a non-qualifying affirmative action program, or that there is a history of discrimination in the workplace. See Sutherland, 344 F.3d at 616; Thomas R. Haggard, Understanding Employment Discrimination § 6.04 (2001).

There is simply not sufficient evidence on the record to conclude that any such

11

background circumstances exists. While it appears that Beard's group consisted of five females and three males, it is also clear from the record that Beard's group included a few other male individuals as well. These males were considered "co-op individuals." Nichols alleges that co-op individuals were treated separately, however, there is no evidence on the record about this. Here, the record shows that the majority of positions of authority were occupied by males, including three OJIs: Chaffin, Joseph Patrick, and Nick Niccolich. While Beard is a female, her superior, Lee, a male, ultimately made the decision to terminate Nichols' employment. The Court finds that there is not present sufficient evidence to suggest that there are background circumstances to support an inference of reverse discrimination.

Plaintiff has clearly established prong two of the prima facie case because he suffered an adverse employment action in that he was given the option to resign for cause or be fired during the probationary period of his employment. Next, Nichols asserts that he was "qualified" for the position he held, as required by prong three. In Cline v. Catholic Diocese of Toledo, 206 F.3d 651 (6th Cir. 2000), the Sixth Circuit cautioned that courts must not use the "qualified" element of the prima facie case in order to heighten the plaintiff's initial burden. Id. at 660-66. In an effort to ensure that the first two stages of the McDonnell Douglas inquiry remain analytically distinct, and that a plaintiff's initial burden not be too onerous, Cline requires that the "qualified" prong of the prima facie case be evaluated in light of the plaintiff's employment record "prior to the onset of the events that the employer cites as its reason" for its decision. Id. at 662-63. "In other words, when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating

plaintiff." Id. at 661.

In this case, the record shows that Beard informed Nichols that the IRS intended to terminate Nichols' employment for integrity issues, based upon the facts given to Lee by Beard regarding various time reporting issues. The first time reporting issue appeared to have occurred on September 14, 2001, the day that Nichols allegedly went home early after a day of field work with Chaffin. Nichols' employment record in this position prior to these alleged happenings is therefore quite short. Nichols asserts that he was well qualified for the ROT position, having graduated in 1996 with a B.B.A. from Austin Peay State University. Nichols also provides evidence of praise that he received for his work. Specifically, Nichols points to written praise from Chaffin on five dates, two of which occurred prior to the September 14, 2001 incident: first on August 31, 2001, and again on September 10, 2001. Nichols also alleges that Chaffin verbally praised his work in the field. Finally, Nichols asserts that Beard informed Nichols in writing on September 4, 2001, that he had done a good job on a particular field assignment. The Court finds that Nichols meets this third prong of the prima facie case.

While Plaintiff meets the second and third prongs of the prima facie case, Plaintiff cannot prove the final prong of the prima facie case. Plaintiff must establish that Defendant treated similarly situated males differently than those in the protected group. Under Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998), in this Circuit, to be "similarly situated" requires that "the plaintiff demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects." The Goodyear court explained that this is a case-by-case analysis, and guided courts to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employed."

13

Id.  The court further explained, "the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'"  Id.  This approach ensures that the "remedial purposes of the anti-discrimination statutes," are met because "if the non-protected employee to whom the plaintiff compares himself or herself must be identically situated to the plaintiff in every single aspect of their employment, a plaintiff whose job responsibilities are unique to his or her position will never successfully establish a prima facie case (absent direct evidence of discrimination)."  Id.

Sixth Circuit law thus provides courts with a great deal of discretion to define who is "similarly situated" based on the facts of each case.  In support of his claim that he was treated less favorably than similarly situated females, Nichols compares the treatment of the individuals in Beard's training group, which the Court finds is an acceptable method of comparison.

Nichols first argues that none of the males in Beard's group successfully completed the ROT program.  Plaintiff's brief, however, is unclear on this point;  Plaintiff states that Beard's group consisted of five females and three males, including Nichols, Sammy Crabtree, and Michael McThiernan. (Doc. No. 29 at 18).[1]  In support of the statement that none of these three trainees completed the training program, Plaintiff states "Plaintiff was forced to resigned [sic] on October 19, 2001; Sammy Crabtree returned to his previous IRS position as Beard made the decision not to keep him as a Revenue Officer."  Id.  There is no elaboration on the reason for Sammy Crabtree's departure or what happened to Michael McThiernan.  Additionally, Plaintiff

---

[1]It is also clear from the record that Beard's group included a few other male individuals. While it appears that these males were considered "co-op individuals," and there is testimony from Nichols and other Revenue Officers suggesting that co-op individuals may not be similarly situated, more information may have been probative.

does not offer any statistical information regarding the relative success of female trainees in the ROT program, which may have also been probative. Finally, the Court does not find Nichols' statistical information regarding the success or failure of the three male ROTs sufficiently probative to establish a prima facie case of sex discrimination.

Plaintiff has not set forth sufficient information to show that even he alone was treated differently than similarly situated females. First, with respect to Chaffin's treatment of Plaintiff, Nichols argues that Chaffin refused to help him on many occasions, made inappropriate gestures behind Nichols' back in front of others, yelled at Nichols inappropriately, and generally disapproved of his lifestyle. In his deposition, Nichols stated:

> There would be situations where you would be unclear on something and he would never help you. He would just always – he would give you a hint or lead you in the right direction, and if you had a problem you'd have to submit another routing slip and then wait for approval on that and then he'd say, well, do this now. Rather than just coming and helping you with the problem, he would kind of lead you along for a while.

Nichols Dep. at 124.

Nichols also asserts that Chaffin spent more time with, and more readily assisted, ROT Darlene Miller ("Miller") than Plaintiff and the other male trainees. According to Plaintiff, "[d]uring the first three days of training, Chaffin sat at Ms. Miller's desk to show her how to do everything." Yet, Nichols also states that Miller, as well as ROT Linda Glenn, was more experienced, suggesting that these women may have not been similarly situated. In his deposition, Nichols states, "a lot of times they didn't need help. They both had a collection background, I believe, for years." Nichols Dep. at 151. The fact that these two female trainees had extensive work experience in collections is correlative to the fact that "when it come [sic]

15

time for going into the field, they were the first to go.  And when it came time for someone to be able to go by themselves, they were the first ones to be turned loose."  Nichols Dep. at 151.  Even if they are similarly situated, there were five females in the group; there is no evidence that any alleged favoritism of Miller or Linda Glenn was based on sex.

    Beyond Nichols' specific allegation that two out of the five female ROTs were treated better than he was treated, Nichols makes mere generalized accusations that Chaffin did not spend enough time with him.  Nichols claims that his assertions regarding Chaffin's discriminatory behavior were confirmed by Joseph Patrick ("Patrick"), a former OJI for the group managed by Beard.  In an investigational interview conducted on October 23, 2001, Patrick stated that he felt that all of the trainees were not treated the same.  In particular, he stated that Chaffin spent more time with Miller than with Nichols and Elysia Wilcox.  While this statement lends credence to Nichols' feeling that not everyone was treated the same in his position, it does not support the notion that Nichols was treated differently than those outside of the protected class, in that Elysia Wilcox is not male.

    With respect to Beard, Plaintiff's main assertion is that Beard was more available to one or two female ROTs and ignored him.  Nichols asserts that Beard made it clear through her actions toward Plaintiff that she did not want to speak with him, and that on more than one occasion when Nichols would speak to Beard in passing, Beard would not respond.  Yet Nichols has not proffered specific evidence showing that any female employee similarly situated to Nichols was treated more favorably by Beard.

    Nichols also claims that Patrick explained that his main problem with Beard was that she directed him to treat ROTs differently.  Nichols, in his affidavit, asserted that Patrick claimed

16

that Beard would expect him to give one employee a hard time and another employee an easier time. Nichols also claims that Patrick stated that the training program was not operated in a manner for everyone to succeed and have an equal chance to succeed. Even taken as true, this information does not lead to the conclusion that trainees were treated differently based upon their sex. In fact, in Sammy Crabtree's affidavit in the EEO Investigative File, he states, "My experience during this training phase has not been pleasant. The feeling imposed on us by the OJIs and the Group Manager, Diane [sic] Beard, was that we were not going to make it. There was a constant apprehension as to who was and who was not going to make it." EEO Investigative File at 90. There is no evidence from Crabtree's affidavit that any of the unpleasantness he experienced during the training phase was due to his sex.

Finally, Nichols asserts that two revenue officers in another group not managed by Beard, Kip Williams and Kevin Smith, warned Nichols on numerous occasions that Beard hated young educated males like Plaintiff. Nichols claims that they also told him that Beard did not like either of them, and would discriminate against them if given the chance. The Court finds that even viewed in a light most favorable to Nichols, this evidence of possible bias is insufficient to support the conclusion that Beard treated males differently than similarly situated females.

The Court finds that while there is some evidence in the record that Nichols was not treated favorably by Chaffin or Beard, Nichols has not set forth sufficient evidence to establish the fourth prong of his prima facie case of sex discrimination. Because Plaintiff fails to meet the first and fourth prongs of his prima facie case, his claim for reverse sex discrimination must fail.

17

**B.  Hostile Work Environment Based on Sex Discrimination**

To establish a prima facie case of hostile work environment **based on sex discrimination,** a plaintiff must show: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on his sex; (4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability.  Newman v. Fed. Express Corp., 266 F.3d 401, 405 (6th Cir. 2001).  Once the plaintiff has established a prima facie case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for his or her actions.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the defendant proffers a legitimate reason for its actions, then the plaintiff must demonstrate, by a preponderance of the evidence, that the defendant's proffered reason is pretextual.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981), citing McDonnell Douglas, 411 U.S. at 804;  Kline v. Tenn. Valley Auth., 128 F.3d 337, 342 (6th Cir. 1997).  The Court must also consider whether the "constellation of surrounding circumstances, expectations, and relationships" formed a hostile or abusive workplace environment from both an objective and a subjective perspective.  Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

The Court begins by considering the frequency of discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with Plaintiff's work performance.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) (citations omitted).  Before the Court can reach the objective test, it must first determine "that there is a

18

bare minimum level of gender-related conduct to consider; conduct that bears no signs of sex or gender-related animus does not become part of the calculus. With this in mind, the probative value of many of the allegations which bear no characteristics of sexually harassing conduct may be discounted in their entirety." Shoemaker-Stephen v. Montgomery County Bd. of Comm'rs, 262 F.Supp.2d 866, 879-880 (S.D. Ohio 2003).

An employer's conduct need not be explicitly sexual in nature for it to create a hostile working environment based on sex. "[H]arassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." Williams v. Gen. Motors Corp., 187 F.3d 553, 565 (6th Cir. 1999). However, the "based on sex" standard must meet a "but for" causation test. "Non-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, he would not have been the object of harassment." Bowman v. Shawnee State, 220 F.3d 456, 463 (6th Cir. 2000); Williams, 187 F.3d at 565 ("[a]ny unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the Harris standard, constitute a hostile environment in violation of Title VII."). In conducting this inquiry, the Sixth Circuit has held that "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. (citing Oncale v. Sundower Offshore Servs, Inc., 523 U.S. 75 (1998)).

In this case, Plaintiff alleges that his work environment was permeated with discriminatory intimidation, ridicule and insult sufficiently severe to alter the conditions of his employment and create an abusive working environment. Plaintiff largely relies upon the

instances set forth above in support of his hostile work environment claim. While it seems that the interactions between Chaffin and Nichols may have provided for an unpleasant work atmosphere, there is insufficient evidence in the record that any of the angst between Chaffin and Nichols was related to Nichols' sex. In fact, Nichols himself asserts that Chaffin did not approve of his lifestyle. In his deposition, Nichols states that Chaffin "made it clear that his lifestyle was much different and that he was a role model and that I was not. And he made it clear to me that as a male, that his impression of me is he was more of a man than I was because of his lifestyle and that mine needed to change." Pl. Dep. at 144. The Court finds that this allegation bears no sign of gender-related animus, but rather suggests Chaffin's dislike or disapproval of Nichols, as a person, and of Nichols' lifestyle.

Plaintiff adds that Chaffin continually yelled at him in an inappropriate manner, refused to help him, and even refused to let him seek help from another OJI. Again, Plaintiff has failed to produce evidence that these actions were sex-based. Nichols does claim that Chaffin spent more time with female ROT Miller than he did with Nichols; this alone is not sufficient to make out a claim for a hostile work environment. With respect to Beard, Nichols offers only that he was told by two other male employees that Beard did not like young educated males, and that he felt Beard ignored him. The Court finds that Nichols has not set forth evidence of an environment that was sufficiently hostile to meet the burden under Title VII.


## C. Discrimination Based on Religion

In a Title VII action for religious discrimination, the plaintiff has the initial burden of establishing a prima facie case that his employer discriminated against him because of his

20

religion.  <u>Beaven v. Commonwealth of Ky.</u>, 783 F.2d 672, 675 (6th Cir. 1986).  To meet this

burden, ordinarily a plaintiff must show: (1) that he was a member of a protected group, (2) that

he was subject to an adverse employment decision, (3) that he was qualified for the position, and

(4) that he was treated less favorably than those outside the protected class.  <u>Warfield v. Lebanon

Corr. Inst.</u>, 181 F.3d 723, 728-29 (6th Cir. 1999), <u>citing</u> <u>McDonnell Douglas</u>, 411 U.S. at 792.

Defendant, in support of his motion for summary judgment, argues first that Nichols cannot meet

the first requirement of his prima facie case because he has identified himself as having no

religion, and that is not a protected class under Title VII.  Indeed, this is not a case where

Nichols claims that he was discriminated against or fired due to his own religious practices or

beliefs.  Instead, Nichols asserts that he was discriminated against because he did not hold the

same religious beliefs as his supervisor, Chaffin.

     The Court adopts the approach of the Tenth Circuit, which held, "Where discrimination is

not targeted against a particular religion, but against those who do not share a particular religious

belief, the use of the protected class factor is inappropriate."  <u>Shapolia v. Los Alamos Nat. Lab.</u>,

992 F.2d 1033, 1038 (10th Cir. 1993).  This Court will follow the standard established in

<u>Shapolia</u> and require Nichols to establish a prima facie case by showing "(1) that he was

subjected to some adverse employment action; (2) that, at the time the employment action was

taken, the employee's job performance was satisfactory; and (3) some additional evidence to

support the inference that the employment actions were taken because of a discriminatory motive

based upon the employee's failure to hold or follow his or her employer's religious beliefs."  <u>Id.</u>;

<u>see also</u> <u>Sattar v. Motorola, Inc.</u>, 138 F.3d 1164, 1170 (7th Cir. 1998).

     Applying the first prong, the Court has already found that Nichols was subjected to an

adverse employment action when he was given the option to resign or be fired. Also, the Court has found that Nichols has proffered evidence showing he was performing his job satisfactorily at the time the employment action was taken. The Court finds that Nichols has established the second prong of his prima facie case.

Finally, as to the third prong, there is no evidence in the record revealing the religious affiliation of Lee or Beard, and in fact, Nichols does not assert that Lee or Beard directly discriminated against him based upon his religion. Rather, Nichols asserts that Chaffin discriminated against him because Nichols did not go to church and was not religious. In support of this assertion, Nichols offers many examples of how Chaffin impressed his religion upon him. Chaffin allegedly indicated that Nichols' Rolex and Corvette were examples of Nichols' ungodly life. Chaffin allegedly told Nichols, more than once, that his priorities were not in order because he did not attend church and was not married. Nichols also claims that Chaffin would impress his religion on Nichols by stating that church was the number one thing in Chaffin's life, that Chaffin was a deacon in the church and as such was a role model, and Nichols was not a role model. Nichols argues that Chaffin degraded Nichols because he did not go to church, and that Chaffin would regularly belittle Nichols and would frequently give him sermons about religion, emphasizing the values of "his" religion and the need for Nichols to bring religion into his life so that he might get his priorities straight.

ROT Sammy Crabtree stated during the internal investigation of Nichol's EEO claim:

> my personal opinion is that there was a personal conflict from day one because there [sic] personalities did not match. Mr. Chaffin talked about going to church, and that his life was his family and his religion, who talked about his beliefs and morals. Mr. Nichols, on the other hand, is single, what people consider to be a "womanizer" who likes to go out with pretty girls and have a good

time. In addition, he is a sharp dresser who takes care of his
appearance and can afford to spend his money on himself. This
contrast of personalities created problems in the work
environment.

EEO Internal Investigation at 88-89. Other employees corroborated that Chaffin would often

make inappropriate gestures behind Nichols' back, would question Nichols' morals and priorities

in front of other employees, and would often talk about his religion and the important role of

religion in Chaffin's life.

Chaffin, as Nichols' OJI, had the authority to issue Nichols memoranda regarding time

reporting issues. Chaffin also unquestionably shared his views about Nichols' performance with

Beard. Thus, the Court finds that Plaintiff has proffered evidence sufficient to raise the inference

that the adverse employment action taken against him was taken, at least in part, because of a

discriminatory motive.

Plaintiff has thus established a prima facie case of discrimination based on his failure to

comport with Chaffin's religious beliefs. In doing so, he has created a presumption that

Defendant unlawfully discriminated against him. McDonnell Douglas, 411 U.S. at 802. The

burden now shifts to Defendant to proffer some legitimate non-discriminatory reason for the

adverse action taken against Plaintiff. Tex. Dep't. of Comty. Affairs v. Burdine, 450 U.S. 248,

253 (1981).

In this case, Defendant claims that Plaintiff was forced to resign or be fired due to

integrity issues regarding improper time keeping incidents. In support of this argument,

Defendant notes that Nichols was reprimanded for alleged time reporting inaccuracies on three

separate occasions. First, Nichols was accused of stealing government time when he returned

home after a day of field visits and did not input his case histories for the day. Nichols claims

23

that he arrived home at 4:15 p.m., and that his usual day in the office ended at 4:45 p.m., but since he had not taken his two fifteen minute breaks for the day he assumed his day was over when he arrived home.  Chaffin, on the other hand, contended that Nichols was to work every day within a time schedule based upon the time Nichols usually arrived home from work.  That is to say, if  Nichols arrived home from work usually at 5:45 p.m. or 6:00 p.m., then when he was in the field, Nichols should plan to arrive home at the same time.

Defendant also points to the dental appointment incident, in which Beard accused Nichols of taking leave to get his braces installed without getting prior approval.  Nichols asserts that he had the procedure done in the break time he had - forty-five minutes for lunch and two fifteen minute breaks - and that he therefore did not feel it was necessary to ask for prior approval to take leave.  Finally, Defendant references other evidence, such as a memo by Chaffin telling Nichols that he should have made more contacts on a particular site visit, or should have planned his day more efficiently on another occasion.  Defendant has met its burden of production by setting forth a legitimate non-discriminatory reason for the adverse action taken against Nichols.

Plaintiff must now prove, by a preponderance of the evidence, that the legitimate reasons put forth by Defendant were not its true reasons, but a mere pretext for discrimination.  Plaintiff has proffered evidence suggesting that there was no IRS requirement that case histories be typed on the same day a field visit is made.  Also, Plaintiff has offered testimony from other employees who stated they did not know of any requirement to take a laptop into the field or to input case histories before coming back into the office after having been in the field.

After the first time reporting incident stemming from the September 14, 2001 field visits,

24

Plaintiff asserts that he wanted to go to Beard to discuss his apparent misunderstanding of time reporting procedures. Yet Plaintiff claims that Chaffin instructed him not to speak with Beard under any circumstances, and instead insisted that he would take care of the situation. Beard, herself, testified that this would be inappropriate behavior on the part of an OJI. Thus, if true, this incident shows that Beard could have been improperly influenced in her views of Nichols as an employee because of Chaffin's actions. Moreover, Plaintiff asserts that even if he was, in fact, wrong in assuming that his tour of duty was over that day when he arrived home, Chaffin manipulated the situation by asking Nichols what he did after he got home that day. It appears that what Chaffin reported to Beard was that Nichols had taken a nap and gotten a haircut on government time.

Second, with respect to Nichols' dental appointment, the Court notes that there is no evidence in the record of any rule stating that an employee could not take a forty-five minute lunch and two fifteen minute breaks together at one time, so as to schedule an appointment as Nichols did. Importantly, the Court notes that it is not clear from the record if such time keeping rules do not formally exist in the IRS or if they have merely been omitted from the record. The maintenance of such formal rules and procedures tends to alleviate employee misunderstandings and prevent litigation.

The evidence shows that Lee relied upon information provided to him by Chaffin and Beard in deciding to terminate Nichols' employment. The Court concludes that Nichols has proffered evidence of a religiously discriminatory animus on the part of Chaffin. Chaffin at least had influence over the information that Beard received, which ultimately led to Lee's termination of Nichols. The Court finds that Plaintiff has produced sufficient evidence to show

that a

genuine issue of fact exists with respect to whether Defendant's stated reasons for its actions were pretextual.  Summary judgment is inappropriate on this claim.

## D.  Hostile Work Environment Based on Religion

In order for Nichols to establish the existence of a hostile work environment based on religion, he must show: (1) he is a member of a protected class; (2) he was subjected to unwelcome religious harassment; (3) the harassment was based on religion; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability.  Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).

As discussed above, in the context of Nichols' claim of discrimination based on religion, the "protected class" requirement is inappropriate in a case like this where the plaintiff asserts that he was subjected to a hostile work environment because he did not share the particular religious beliefs of his supervisor.  The hostile working environment standard was also discussed above; whether a work environment is hostile and abusive is determined by looking at the totality of the circumstances.  See Hafford, 183 F.3d at 512; see also Williams v. Gen. Motors Co., 187 F.3d 553, 562-64 (6th Cir. 1999).  The circumstances to examine may include:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while

psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris, 510 U.S. at 23. "Courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility." Williams, 187 F.3d at 563.

A plaintiff alleging hostile work environment must establish that the environment was both objectively hostile, and that he subjectively perceived the environment to be hostile. Id. at 564. The Court finds that Nichols has proffered sufficient evidence to establish that he was subjected to unwelcome religious harassment by Chaffin, as described above, thus precluding summary judgment for Defendant.

With respect to the third prong of this test, Defendant argues that Nichols has asserted that Chaffin did not approve of his lifestyle, as opposed to religion. Defendant points to Nichols' statement that Chaffin "made it clear that his lifestyle was much different and that he was a role model and that I was not. And he made it clear to me that as a male, that his impression of me is he was more of man than I was because of his lifestyle and that mine needed to change." Yet the record also shows many examples of instances in which Chaffin allegedly chastised Nichols for not going to church, and for not having his priorities in order such that religion would be at the forefront of Nichols' life as it was in Chaffin's life. The Court finds that Nichols has proffered sufficient examples of harassment based upon Nichols' failure to conform to Chaffin's religious beliefs to establish a prima facie case of a hostile work environment based upon religion.

As to the fourth prong, Nichols has also provided evidence that this harassment interfered with his ability to perform his job. Chaffin allegedly failed in his duty to provide one-on-one training for Nichols and instead ignored Nichols and insisted that Nichols not seek assistance

27

from other OJIs. Nichols specifically asserts that he never even received a password for a computer program called Choice Point and did not receive adequate training in other programs, rendering him less able to prepare for and successfully perform his job duties. Further, Nichols alleges, and other employees corroborate, that Chaffin would make inappropriate gestures and remarks to Nichols in the presence of other employees. Plaintiff argued that this harassment caused him embarrassment, intimidation, ridicule and insult. Thus, Nichols set forth sufficient evidence of an objectively hostile work environment based on religion, and also proffered evidence that Nichols subjectively felt that his work environment was hostile and abusive.

Finally, for Plaintiff to establish a prima facie hostile work environment claim he must also establish the existence of employer liability. Because Nichols argues that this allegedly hostile work environment was created by Chaffin based on Nichols' failure to comport with Chaffin's religious beliefs, the Court must determine the proper liability attributable to the IRS for Chaffin's conduct. In a hostile work environment case, the status of the alleged harasser has a determinative impact on the elements the plaintiff must prove and the defenses available to the defendant. See Williams, 187 F.3d at 560. If the harasser is a co-worker, the plaintiff must show the defendant, through its supervisory or management level employees, failed to take appropriate and effective action once it had notice of the alleged offensive conduct. Id. at 561. However, the Supreme Court has held, "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher v. City of Boca Raton, 524 U.S. 775, 805 (1998). In certain instances, though, a defendant may raise an affirmative defense to vicarious liability. Accordingly, whether Chaffin is a supervisor or a co-worker determines the test.

28

As such, the first issue the Court must determine is whether Chaffin qualifies as a "supervisor" for the purpose of imputing liability to Nichols' employer. There is significant debate over the authority one must have to qualify as a supervisor. The courts of this circuit have had occasion to rule on this issue in several cases. See Kauffman v. Allied Signal, Inc., Autolite Div., 970 F.2d 178 (6th Cir. 1992) (holding a genuine issue of fact existed regarding whether a harassing supervisor exercised "significant control" over an employee's employment conditions to justify imputing liability to their employer, precluding summary judgment on a quid pro quo sexual harassment claim and holding that liability may be imputed to an employer for quid pro quo harassment by anyone in a supervisory position with authority over hiring, advancement, dismissal, and discipline, under a theory of respondeat superior.); Stevens v. United States Postal Serv., 21 Fed. Appx. 261 (6th Cir. 2001) (finding a postal service employee with informal supervisory duties, but who did not have the formal title of supervisor nor the power to hire or fire a postal clerk was not a "supervisor" for purposes of a Title VII sexual harassment claim); Vernarsky v. Covenant Transport, Inc., 2003 WL 21212776 (E.D. Tenn. 2003) (holding that truck driver trainers who did not have the authority to hire or fire trainees, and could not act without the approval of their own supervisors, were the Plaintiffs' co-workers rather than supervisors for purposes of employer liability for alleged sexual harassment).

In this case, Chaffin held the position of on-the-job instructor. He had the ability to dictate the daily work activities of his trainees, including Nichols, and the authority to issue disciplinary memoranda to them. It is not clear from the record whether Chaffin had the authority to issue disciplinary notices to his trainees without first seeking authority from his supervisor, Beard. Further, Chaffin, by his own admission, had no authority over the hiring and

29

firing process. Thus, the Court finds that a genuine issue of material fact exists as to whether Chaffin, in his position as an on-the-job instructor should be considered a supervisor, or simply a co-worker or low-level supervisor, such that the negligence standard would be used to determine employer liability, making summary judgment inappropriate.

Were the Court to have determined that Chaffin should be considered a co-worker or low-level supervisor because he lacked authority over the hiring and firing process, then the negligence standard would apply. The negligence standard is based on a "reasonableness" standard: "when an employer responds to charges of co-worker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." Blankenship v. Parke Care Centers, Inc., 123 F.3d 868, 872-73 (6th Cir.1997), cert. denied, 522 U.S. 1110 (1998). Nichols admits that he never told Beard or any other manager that he felt uncomfortable with Chaffin's comments and, as Nichols called them, "sermons" about religion. Nonetheless, several other employees have corroborated that Chaffin talked a lot about his religion and the importance of it in his life. As mentioned above, Nichols co-workers also witnessed Chaffin demeaning Nichols and questioning his morals in the context of religion-based conversations.

If the Court were to have found that Chaffin was a supervisor, then further inquiry into employer liability would be necessary. Under Title VII, an employer is vicariously liabile if a supervisor engages in harassing conduct that results in a tangible employment action. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). An employer will also be vicariously liable in situations where a supervisor has created an actionable hostile environment, but no tangible employment action is taken.

Ellerth, 524 U.S. at 764-65. However, in these cases liability is subject to an affirmative defense. An employer will avoid vicarious liability if it can show by a preponderance of the evidence that (a) it exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Id. The Court need not decide this issue now, having found that a genuine issue of material fact exists as to whether Chaffin is a supervisor or an employee. Summary judgment on this claim is inappropriate.

**E. Retaliation**

To establish a claim of Title VII retaliation, a plaintiff must show: (1) he engaged in activity protected under Title VII; (2) that activity was known to his employer; (3) the employer thereafter took an employment action adverse to the plaintiff or the plaintiff thereafter was subjected to severe or pervasive retaliatory harassment by a supervisor, and (4) a causal connection existed between the protected activity and the adverse employment action. Akers v. Avery, 338 F.3d 491, 497-98 (6th Cir. 2003), citing Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000). Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to offer a "legitimate, non-discriminatory reason" for the complained of employment action. Nickell v. Memphis Light, Gas, and Water Div., 2003 WL 22205073, at *4 (6th Cir. 2003), citing Tex. Dep't. of Comty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Nichols asserts that Beard discriminated against him in retaliation for his having filed an

EEO complaint when she answered questions posed to her by the background investigator regarding Plaintiff's application for a CID position. Specifically, Nichols asserts that he was told that if he resigned, his slate with the IRS would be clean. However, Beard told the background investigator that Plaintiff had resigned, but yet declined to provide a reason. Also, Beard stated that she would not rehire Plaintiff and would not recommend him for re-employment with the IRS due to an ethical issue. Beard did not elaborate on the ethical issue she had with Nichols.

The Court finds that Nichols clearly has established the first three prongs of the prima facie case of retaliation. The Supreme Court has held that because the term "employees," as used in Section 704(a) of Title VII, includes former employees, a plaintiff may sue his or her employer for its allegedly retaliatory post-employment actions. See Robinson v. Shell Oil Co., 519 U.S. 337 (1997). Nichols did engage in a protected activity by filing his first EEO complaint alleging discrimination and hostile work environment based on sex and religion, and Defendant was aware of Nichols' EEO activity. Regarding the third prong of Plaintiff's prima facie case of retaliation, it is well established that in some circumstances an employer's negative remarks or referral comments to a former employee's prospective employer can constitute an adverse employment action against the former employee. See id. Many courts addressing the post-employment issue have afforded protection to plaintiffs in connection with a former employer's negative performance evaluations to a prospective employer. See, e.g., Durham Life Ins. Co. v. Evans, 166 F.3d 139, 157 (3rd Cir. 1999) (post-employment actions by an employer can constitute discrimination under Title VII if they hurt a plaintiff's employment prospects); Sherman v. Burke Contracting, Inc., 891 F.2d 1527 (11th Cir. 1990) (alleging former employer persuaded current employer to discharge employee for employee's participation in charge against

former employer); <u>Rutherford v. American Bank of Commerce</u>, 565 F.2d 1162 (10th Cir. 1977) (advising prospective employer that plaintiff had filed sex discrimination charges).

Finally, to set forth a prima facie case of retaliation against Defendant, a plaintiff must proffer evidence showing that a causal connection existed between the protected activity and the adverse employment action. Here, Nichols' proffer of evidence must raise an inference that Beard's comments contributed to CID's decision not to hire Nichols for their special agent position. In response to Defendant's discovery requests, Plaintiff provided the Objection for Suitability Reasons page from his suitability determination file. In addition to the comments made by Beard to the background investigator concerning Nichols' resignation of October 19, 2001, the Objections form also states that Nichols worked for the IRS as a seasonal customer service representative from November 8, 1999, until April 8, 2000, during which time Nichols was charged AWOL for failing to adhere to leave procedures. The form further states that Nichols' attendance during the probationary period was unsuitable for retention as a customer service representative. Finally, the Objections form states that Nichols worked for the United States Census Bureau from April 25, 2000, until July 31, 2000, when he was terminated for Lack of Work. The document reveals, "[Nichols] did not disclose the employment on his SF85P. Mr. Nichols also owes a government travel advance for approximately $519.00." Plaintiff's Dep. Ex. 35. In conclusion, the reviewing body stated, "Mr. Nichol's employment with the Internal Revenue Service has not been stable. He has resigned in lieu of termination two times within two years. We believe this inability to retain employment with the IRS shows a pattern of conduct that could seriously hamper his ability to perform the full aspect of the Special Agent duties and responsibilities. We are objecting to Mr. Nichols for the above reasons." <u>Id.</u>

33

The Court finds that Plaintiff has proffered evidence sufficient to show that there exists a genuine issue of material fact concerning the causation element, particularly as to whether Beard had a retaliatory motive in making her remarks to the background investigator regarding Nichol's employment as a ROT, especially after allegedly telling Nichols that she would not say anything at all. Summary judgment, thus, must be denied on this claim.

## IV. CONCLUSION

For the reasons stated herein, the Court finds that Plaintiff has failed to set forth a prima facie case of employment discrimination based on sex and has failed to set forth a prima facie case of hostile work environment based on sexual harassment. With respect to these two claims, Defendant is thus entitled to judgment as a matter of law and the motion for summary judgment is GRANTED. In addition, Plaintiff's claims brought pursuant to the THRA are DISMISSED.

The Court finds that Plaintiff has demonstrated that genuine issues of material fact exist with respect to issues central to Plaintiff's claims of: (1) termination based on religious discrimination; (2) hostile work environment based upon religious harassment; and (3) retaliation. With respect to these three claims, Plaintiff has met his burden at the summary judgment stage, thus precluding judgment as a matter of law. Accordingly, Defendant's motion for summary judgment is DENIED with respect to these three claims.

It is SO ORDERED.

Entered this the _____ day of _____, 2006.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

34